IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALTON W. SMITH,                          *

          Plaintiff,                     *

     vs.                                 *          CIV. ACTION NO. MJG-17-3051
                                         *
STATE OF MARYLAND, ET AL,                *

          Defendants                     *

*     *     *     *     *     *     *     *     *

MEMORANDUM AND ORDER

The Court has before it Defendants' Motion to Dismiss or,
In the Alternative for Summary Judgment [ECF No. 18],
Plaintiff's Cross Motion for Summary Judgment [ECF No. 21],
Defendants' Motion for Leave to Supplement Their Motion To
Dismiss Or, In the Alternative, For Summary Judgment [ECF No.
26], and the materials submitted relating thereto.  The Court
has held a hearing and has had the benefit of arguments of
counsel.

Both sides have submitted materials in addition to the
Complaint regarding these motions.  The Court has not excluded
these materials from consideration.  When "matters outside the
pleading are presented to and not excluded by the court, the
[12(b)(6)] motion shall be treated as one
for summary judgment and disposed of as provided in Rule 56."
Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 260-

61 (4th Cir. 1998); Fed. R. Civ. P. 12(d). Because the Court has relied on supplemental affidavits and documents filed outside of the pleadings, it will treat the pending motions as motions for summary judgment.

I.  BACKGROUND

    A. Asserted Claims

After his college teaching contract was not renewed in 2016, Plaintiff Alton W. Smith ("Smith" or "Plaintiff") brought an action against his former employer, Baltimore City Community College ("BCCC"),[1] the State of Maryland, and three Individual Defendants:  Tonja L. Ringgold ("Ringgold"), Enyinnaya Iweha ("Iweha"), and Cynthia Webb ("Webb").[2]

Plaintiff asserts claims in Seven Counts:

| Count | Title |
|-------|-------|
| I | Breach of Contract (All Defendants) |
| II | Interference with Economic Relationship (Iweha only) |
| III | Interference with Economic Relationship (Webb only) |
| IV | Interference with Economic Relationship (Ringgold only) |
| V | Conspiracy to Interfere with Economic Relationship (Iweha, Webb, and Ringgold) |

---

[1]  BCCC is a Maryland state entity.
[2]  During the relevant time period, Ringgold was BCCC's Vice President of Academic Affairs, and Iweha and Webb were the Dean and Interim Associate Dean of the business school, respectively.

| VI | Deprivation of Property Without Due Process under 42 U.S.C. § 1983 (All Defendants) |
|----|-----------------------------------------------------------------------------------|
| VII | Deprivation of Property Without Due Process under Maryland Declaration of Rights, Art. 24 (All Defendants) |

B. Background

Plaintiff was an associate professor at BCCC who taught electronics courses from 2005 to 2011 and business courses from 2011 until 2016. Compl. ¶ 5, ECF No. 2.

In August 2015, Smith and BCCC entered into a 3-year teaching contract ("Contract") which required yearly renewal and ran from August 15, 2015 to June 2, 2018. Id. ¶ 6. Under the Contract, he must carry a semester teaching load of 15 Teaching Assignment Units ("TAUs"). Id. ¶ 7. His rights and duties as a faculty member were listed in his Contract and in the BCCC Faculty Handbook ("Handbook").[3]

1.   Academic Program and Course Changes at BCCC

From 2005 to 2013, Plaintiff taught classes in the Electronic Technology and Telecommunications Program ("ETP").

---

[3]   As examples, faculty with a multi-year contract who received an overall evaluation of "Fair" or "Poor" would be put on a one year improvement plan, and faculty terminated for poor performance were to be given 30 days of pre-termination notice and an opportunity to meet with the President of BCCC regarding the termination. Id. ¶¶ 8-11.

Def.'s Mem. at 2, ECF No. 18-1.[4]

In 2009, BCCC notified faculty members that it will eliminate some academic programs for the long term, and in 2011, BCCC's Board of Trustees approved the elimination of 14 programs, including ETP. Def.'s Mem. at 2-3, ECF No. 18-1. Faculty in the ETP program, including Smith, could teach other classes for which they were qualified or could take graduate courses paid for by BCCC to obtain necessary qualifications to teach other programs. Iweha Aff. ¶ 3, ECF No. 18-10.

When the ETP program was eliminated, Plaintiff was not qualified to teach in other discipline-specific programs (except for introductory business courses), and refused the offer to pursue education that would have given him the necessary qualifications. Id. ¶¶ 4-5. Nevertheless, BCCC allowed him to teach-out the remaining ETP students and to teach introductory (but not discipline-specific) courses in the business program. Id. ¶ 5; Webb Aff. ¶ 12, ECF No. 18-12.

In 2013, BCCC created a new program in "Robotics/Mechatronics," and "paid for [] Smith to attend training classes that introduced him to the equipment that would be used in the program." Def.'s Mem. at 4, ECF No. 18-1. Smith took those equipment introduction courses but declined to obtain

---

[4]     During this period, Plaintiff received overall performance evaluation ratings of "Good" or "Very Good." Compl. ¶ 10; Smith Aff. ¶ 7, ECF No. 22-2.

the requisite graduate degree that would qualify him to actually teach robotics courses to students.  Id. at 5.  Ultimately, BCCC rejected Smith's application for a teaching position in the program and hired an individual who had a PhD in Electronics and Mechanical Engineering.  Id.; Iweha Aff. ¶ 6, ECF No. 18-10. Following the denial of his application, Plaintiff filed an EEO complaint against Iweha.  Smith Aff. ¶ 5, ECF No. 22-2.  On April 11, 2014, the investigation was closed on the basis that the discrimination allegations were unsubstantiated.[5]  Pl.'s Cross Mot. Ex. 2d, ECF No. 22-6.

In July 2013, in response to state legislative action, BCCC reduced the number of classes that were deemed "required" to receive a degree for many of its programs, and downgraded certain "required" courses to "electives."[6]  Def.'s Mem. at 5, ECF No. 18-1; Ringgold Aff. ¶¶ 6-7, ECF No. 18-11.  Some of Plaintiff's courses were eliminated due to these decisions and subsequent declining enrollment.  Def.'s Mem. at 5, ECF No. 18-1; Ringgold Aff. ¶ 8, ECF No. 18-11.

---

[5]    Iweha was allegedly warned by BCCC to not retaliate against Smith.  Compl. ¶ 28.

[6]    These reduction decisions were approved by Defendant Ringgold after feedback from faculty, program coordinators, the curriculum committee, and the faculty senate.  Ringgold Aff. ¶ 7, ECF No. 18-11.  Elimination of remaining EFP courses required approval by multiple levels of management at BCCC and the Maryland Higher Education Commission.  Webb Aff. ¶ 17, ECF No. 18-12.

## 2.   Events Leading Up to Termination

In November 2015, Smith was supervised by Defendants Webb and Iweha.  Compl. ¶¶ 12-13.  As a result of the changes in academic programs and courses, supra, Plaintiff was left with teaching only 6 TAUs for the 2016 Spring Semester (i.e., two sections of an introductory business course) instead of the required 15 TAUs required by his contract.[7]  Iweha Aff. ¶ 9, ECF No. 18-10; Def.'s Mot. Ex. 3, ECF No. 18-5.

In early 2016, Defendants Webb and Iweha met with Plaintiff to discuss alternative options for qualifying TAUs, but Plaintiff did not offer viable suggestions as to how he could meet his required TAUs for the semester.[8]  Iweha Aff. ¶ 10, ECF No. 18-10; Webb Aff. ¶¶ 22-23, ECF No. 18-12.

Defendant Webb gave Plaintiff a "Poor" performance evaluation for the 2015-2016 academic school year, based on the low TAUs and her evaluation of his work.  Webb Aff. ¶ 25, ECF No. 18-12.

Webb and Smith met on March 10, 2016 to review his 2015-

---

[7]    Plaintiff alleges that Defendants purposefully manipulated his TAUs to reduce them.  Compl. ¶ 15.  As support, Plaintiff states that before registration was closed for the Spring 2016 semester, Defendant Webb told him that some of his courses had been cancelled due to low enrollment.  Smith Aff. ¶ 9, ECF No. 22-2.  Plaintiff states he was not given prior notice of the cancellations.  Id. ¶ 10.
[8]    Plaintiff argues that he proposed a number of legitimate solutions to his low TAUs, but that his proposals were denied by the administration.  Smith Aff. ¶¶ 10-13, ECF No. 22-2.

2016 evaluation.  The evaluation included a statement that his "contract will not be renewed for the fall 2016 semester." Def.'s Mot. Ex. 1 at 9, ECF No. 18-3.[9]  Plaintiff saw the evaluation, became angry, and was escorted out by security because Webb felt threatened by his presence in her office. Webb Aff. ¶ 26, ECF No. 18-12.  When security arrived, Smith "signed the evaluation" and took it with him.  It was later retrieved and "placed in his mailbox."  Id.

On March 16, 2016, Smith wrote a follow-up letter to challenge the 2015-2016 evaluation, to which Webb responded. See Def.'s Mot. Exs. 6 and 7, ECF Nos. 18-8 and 18-9.  Webb revised a portion of his 2015-2016 evaluation in response to his letter "but the overall rating remained unchanged."  Webb Aff. ¶ 27, ECF No. 18-12.

On June 2, 2016, Defendant Ringgold sent Plaintiff a formal termination letter stating that his teaching contract would not be renewed because of poor performance, discontinuation of the electronics program, and his failure to qualify to teach any discipline-specific business courses.[10]  Def.'s Mot. Ex. 2, ECF

---

[9]    Plaintiff believes that the signature on this evaluation is not his signature.  Rather, he contends that the document's first few pages come from a separate, revised evaluation, and that his signature was used from a previous version.  Smith Aff. ¶ 17, ECF No. 22-2.

[10]    Iweha supported the termination decision because "Mr. Smith did not qualify to teach courses in the Business School and because his performance rating was 'poor.'"  Iweha Aff. ¶ 13.

No. 18-4.  The effective date of termination was stated to be June 5, 2016.  Id.  However, due to an address change, Smith did not receive this letter until September 7, 2016.  Smith Aff. ¶ 23, ECF No. 22-2.

On June 9, 2016, Plaintiff received a letter from the Maryland Department of Budget & Management advising him that his health insurance was terminated and advising him about his right to COBRA benefits.  Smith Aff. ¶ 21, ECF No. 22-2; Pl.'s Cross Mot. Ex. 2m, ECF No. 22-15.  Although this June 9 letter is not in the record, Plaintiff's lawyer wrote a letter to the President of BCCC on June 30, 2016, referring to the June 9 letter and stating that her client had not voluntarily been terminated from his position:

> "Mr. Smith has received a letter dated June 9, 2016 from the Maryland Department of Budget & Management advising him of his right to COBRA benefits due to loss of health insurance effective June 16, 2016 resulting from his separation from the State of Maryland employment.  Mr. Smith has not voluntarily separated from employment."

Pl.'s Cross Mot. Ex. 2m, ECF No. 22-15.

Having received no reply to his attorney's June 30 letter, Smith contacted a human resources specialist at BCCC in early July to confirm the dates of his employment at the College.  Rutah Aff. ¶ 2, ECF No. 18-14.  The human resources specialist stated that Smith had been employed with BCCC from September

2005 to June 2016 and confirmed that Smith had health insurance coverage during that period. Rutah Aff. ¶ 2, ECF No. 18-14. This conversation was memorialized in writing by human resources on July 5, 2016. Def.'s Mot. Ex. 4, ECF No. 18-6.

On September 8, 2016, a day after he received the June 2 formal termination letter, Plaintiff requested a grievance hearing. Def.'s Mot. Ex. 13, ECF No. 18-15. On November 18, 2016, he presented a statement at a "Level 2" grievance hearing conducted by Defendant Ringgold.[11] Ringgold Aff. ¶ 14, ECF No. 18-11. In this "hearing," Smith's attorney was not allowed to participate and Smith was not allowed to call witnesses. Smith Aff. ¶ 24, ECF No. 22-2. Instead, Smith simply read a pre-prepared statement. Id. Defendant Ringgold considered the statement and upheld the termination decision. Ringgold Aff. ¶ 14, ECF No. 18-11. Plaintiff's requests for a "Level 3" hearing and a meeting with the BCCC president were denied. Smith Aff. ¶ 26, ECF No. 22-2.

II.   LEGAL STANDARD

Plaintiff and Defendants seek summary judgment by the instant cross-motions.

A motion for summary judgment shall be granted if the

---

[11]   Plaintiff has also referred to the November 18, 2016 event as a "meeting" and not a "hearing." Pl.'s Reply at 12, ECF No. 25.

pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  [t]he Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  <u>See, e.g.</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-323 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Shealy v. Winston</u>, 929 F.2d 1009, 1012 (4th Cir. 1991).  Thus, in order to defeat a motion for summary judgment, "the party opposing the motion must present <u>evidence</u> of specific facts from which the finder of fact could reasonably find for him or her." <u>Mackey v. Shalala</u>, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added).

When evaluating a motion for summary judgment, the Court must bear in mind that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole,

which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  <u>Celotex</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

III.  <u>DISCUSSION</u>

A. <u>Breach of Contract (Count I)</u>

Defendants argue that the breach of contract claim should be dismissed as to the Individual Defendants because it does not state a valid claim and that it is barred against all Defendants by sovereign immunity.

1.  <u>Individual Defendants</u>

The employment contract at issue is between "the Board of Trustees of the Baltimore City Community College" and Plaintiff. Def.'s Mot. Ex. 3, ECF No. 18-5.  Thus, the Individual Defendants, who are not parties to the contract, owed no individual contractual obligation to Plaintiff.  <u>Taylor v. NationsBank, N.A.</u>, 365 Md. 166, 175, 776 A.2d 645, 651 (2001) ("To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation . . .").

## 2. Timing and Sovereign Immunity

In Maryland, sovereign immunity against breach of contract claims against the state government is waived only if the claims are brought "within 1 year after the later of: (1) the date on which the claim arose; or (2) the completion of the contract that gives rise to the claim."  Md. Code Ann., State Gov't § 12-202.  Section § 12-202 functions as a "condition precedent" for bringing a contract claim against Maryland and/or its officers. Magnetti v. Univ. of Maryland, 402 Md. 548, 564 (2007).

The Complaint was filed in state court on August 23, 2017. Defendants contend that Plaintiff's claim arose on June 5, 2016, the date of his effective termination by the June 2 letter. Def.'s Resp. at 3, ECF No. 24.  Plaintiff counters that any breach did not occur until the June 2 termination letter was received on September 7, 2016.  Pl.'s Mem. at 10, ECF No. 22.

The breach of contract claim is based upon the termination of Plaintiff's employment without proper notice and procedures. Compl. ¶¶ 21-23.  The alleged breach – if there was one – occurred on June 5, 2016, the date of effective termination. Def.'s Mot. Ex. 2, ECF No. 18-4.  Accordingly, Plaintiff's breach of contract claim was filed outside the one-year period for the limited waiver of immunity and is barred.

The Court is not persuaded by Plaintiff's arguments for a later date for the alleged breach.  Plaintiff argues that the

one year limit does not begin to run until the "final action" of the College, which was a letter from Defendant Ringgold denying further internal review on February 22, 2017. Pl.'s Reply at 3, ECF No. 25. He contends that "[a]rguably, a final administrative decision has yet to be reached" because only the College's President can terminate him. Id.

The Court does not accept Plaintiff's theory that each subsequent action (or inaction) by BCCC should be considered as a separate breach for immunity waiver purposes, restarting the one year limit. The statute, Section § 12-202, is not a statute of limitations, but a limited waiver of sovereign immunity. See State v. Sharafeldin, 382 Md. 129, 148 (2004) ("§ 12-202 is not a mere statute of limitations but sets forth a condition to the action itself. The waiver of the State's immunity vanishes at the end of the one-year period."). Maryland courts have intended this provision to be strictly construed. Id. at 140 ("immunity from suit is 'one of the highest attributes of sovereignty,'" and "any waiver of that immunity must come from the Legislature.").

Plaintiff seeks to rely on Frankel v. Bd. of Regents of Univ. of Maryland Sys., 361 Md. 298, 308 (2000). In Frankel, the Court of Appeals of Maryland found that a student's claim for a tuition refund was filed within the time limit because it was filed "within a year from the final administrative decision

denying his request for in-state status and his claim for a refund." Id. However, Frankel did not involve a breach of contract claim, but a claim for in-state tuition status and tuition refund based on policies authorized by state legislation. Id. at 327-328. The discussion in Frankel is inapposite to case presented here, which involves a contract claim for wrongful termination.[12]

The argument that there is still some administrative action necessary to breach the contract is contradicted by the terms of the contract itself. The contract states at Section 5C: "[i]n the event that the Faculty Member is dismissed, this contract shall automatically terminate as of the effective date of the termination and the College shall have no further obligation under this contract." Def.'s Mot. Ex. 3, ECF No. 18-5. Thus, by the plain language of the contract, the contract terminated on June 5, 2016 and any breach of the contract occurred on that date.

---

[12] Indeed, subsequent decisions have clarified that the Court of Appeals did not address the merits of whether § 12-201 to § 12-204 would apply in Frankel. Stern v. Bd. of Regents, Univ. Sys. of Maryland, 380 Md. 691, 705 (2004) ("Neither in this, nor any other section of Frankel, did we address the merits of the question of whether Md. Code §§ 12-201 through 12-204 of the State Government Article waived the Board's immunity in that case . . . [t]he case provides no discussion in that regard.); Magnetti v. Univ. of Maryland, 402 Md. 548, 571 n. 12 (2007) ("It was not necessary for this Court, in Frankel, to determine whether S.G. § 12-201 applied to Mr. Frankel's claim against the University.").

Plaintiff, contending that he did not receive the notice letter until September 7, 2016 due to an incorrect address, argues that the one year period should not begin to run until he was on notice of his termination. The Court has neither been provided with, nor has it found, legal authority supporting the contention that a "notice rule" or "discovery rule" applies to Section § 12-202,[13] which is not a normal statute of limitations.

Even if there were a requirement that Smith was on notice of his termination, that notice was obtained well before the September 7, 2016 receipt of the June 2 letter.

Plaintiff signed an initial version of his 2015 evaluation on March 10, 2016, which stated: "your contract will not be renewed for the fall 2016 semester." Pl.'s Cross Mot. Ex. 2g, ECF No. 22-9. Smith responded to his 2015 Evaluation on May 16, 2016 by letter and discussed the Written Comments, showing that he did read his evaluation. Pl.'s Cross Mot. Ex. 2h, ECF No. 22-10. Even though his evaluation was amended in part, his overall rating remained the same. Pl.'s Cross Mot. Ex. 2i, ECF No. 22-11.

---

[13] The dissent in <u>Towson Univ. v. Conte</u>, 384 Md. 68, 116 (2004) argued that statutory actions based on wrongful terminations begin running when notice of termination is issued by the employer and not when the termination becomes effective. The majority found the analysis inapplicable to a breach of contract claim.

Moreover, in June 2016, Mr. Smith received a notice from the Maryland Department of Budget & Management advising him that his health insurance coverage was being cancelled.  Smith Aff. ¶ 21, ECF No. 22-2.  His attorney wrote a follow-up letter on June 30, 2016, stating:

> "That notwithstanding, Mr. Smith has received a letter dated June 9, 2016 from the Maryland Department of Budget & Management advising him of his right to COBRA benefits due to loss of health insurance effective June 16, 2016 resulting from his separation from the State of Maryland employment.  Mr. Smith has not voluntarily separated from employment."

Pl.'s Cross Mot. Ex. 2m, ECF No. 22-15.

Additionally, in July 2016, Smith reached out to Human Resources to confirm his dates of employment.  Rutah Aff ¶ 2, ECF No. 18-14.  The Human Resources specialist explained that he was employed with the College from September 2005 to June 2016 and that he and his wife had health insurance benefits during that entire period.  Id.  This was later confirmed in a written document sent to Plaintiff on July 5, 2016.  Def.'s Mot. Ex. 12, ECF No. 18-14.

In summary, the Court finds that Plaintiff lacks evidence adequate to permit a reasonable jury to find that his notice of employment termination was as late as September 2016.

Accordingly, Plaintiff did not file his claim within the one year immunity waiver period, and the Court will grant

summary judgment for all Defendants with regard to the breach of contract claim.

### B. Interference with Economic Relationship (Counts II, III, and IV)

Maryland provides immunity to state employees for tort actions that are performed within the scope of their employment and done without malice or gross negligence.  Md. Code Ann., Cts. & Jud. Proc. § 5-522.  Moreover, a claim for tortious interference with an economic relationship in Maryland may only prevail if the Defendant is a third party to the contract or business relationship that was allegedly interfered with. Bagwell v. Peninsula Reg'l Med. Ctr., 106 Md. App. 470, 503 (1995) ("As a matter of law, a party to a contract cannot tortiously 'interfere' with his or her own contract . . . . Neither can an agent of the party to a contract, acting within the scope of the agency, 'interfere' with the contract.").

Plaintiff states in Counts II – IV that the Individual Defendants intentionally interfered with his TAUs and performance evaluations in order to terminate his teaching contract.  He argues that they were not acting within the scope of their employment because they had no authority to make the final determination to terminate Plaintiff's contract; only the President of BCCC had such authority.  Pl.'s Reply at 3, ECF No.

25.  He also states – without specific supporting factual allegations - that the Individual Defendants, especially Defendant Iweha, acted with malice and/or gross negligence. Pl.'s Mem. at 12-18, ECF No. 22.

### 1.  Scope of Employment

The record does not present evidentiary support for the arguments that Individual Defendants Iweha, Webb, and Ringgold acted outside the scope of their employment with BCCC.  Their actions related to course registrations, programs administration, teacher evaluations, and hiring decisions, all of which fall within the scope of their official duties as agents of BCCC.  See, e.g., McReady v. O'Malley, 804 F. Supp. 2d 427, 445 (D. Md. 2011), aff'd, 468 F. App'x 391 (4th Cir. 2012) (finding as a matter of law that "the actions of [the University's] agents . . . cannot form the basis of an intentional interference with contractual relations claim.").

Defendant Iweha was accused by Plaintiff of discrimination when Iweha chose to hire another professor for the new Robotics/Mechatronics position, but he made that hiring decision as the Dean of the Business Administration.  Compl. ¶¶ 28-32; Iweha Aff. ¶ 6, ECF No. 18-10.  Iweha is blamed for relying on an incorrect 2013-2014 performance review to recommend not

renewing Plaintiff's contract, but his recommendation was also made in his official capacity as Dean.  Iweha Aff. ¶ 13.

Defendant Webb's actions in evaluating Plaintiff's business courses (including classroom visits and review of his work) were within her scope of duties as the Interim Associate Dean of the Business Administration.  Webb Aff. ¶ 25, ECF No. 18-12.  And Defendant Ringgold's actions in overseeing Plaintiff's TAUs and issuing a formal decision not to renew Plaintiff's contract were undertaken in her capacity as Vice President of Academic Affairs.  Ringgold Aff. ¶¶ 1-2, 12.

Plaintiff argues that the Individual Defendants' actions should be deemed outside the scope of their employment because the Contract and the Faculty Handbook state that the BCCC President has the authority to make termination decisions. However, the Individual Defendants were high level administrative officials at BCCC and were acting as agents of BCCC and the President.  The record does not support the contention that finding that they lacked authority to take the actions that they did.  Indeed, the BCCC President was copied on Smith's termination letter.  Def.'s Mot. Ex. 2, ECF No. 18-4.

## 2. Allegations Regarding Personal Animus

The Court finds that Plaintiff's conclusory allegations that the Individual Defendants acted with ill motive, malice, or gross negligence in terminating his contract are not adequately supported.

As for Defendant Iweha, the record does not support the conclusory allegation that Iweha retaliated against Plaintiff for the EEO complaint by "work[ing] with Defendant Webb to manipulate Plaintiff's TAUs."[14]  Pl.'s Mem. at 12, ECF No. 22. Plaintiff argues that Iweha also tried to "manipulate" his TAUs in 2015 and was stopped from doing so by Dean Evans, but does not offer factual support for this allegation.  Compl. ¶ 30. Allegations that Iweha was "motivated by his personal goal to remove Plaintiff from BCCC" are similarly unsupported by specific facts.  Pl.'s Mem. at 13, ECF No. 22.

Defendant Webb was accused of "manipulating" Plaintiff's TAUs and recommending nonrenewal based on inaccurate information, but the record does not support such a finding of calculated manipulation.  Rather, based on the record, Plaintiff had low TAUs for Spring 2016 due to several reasons, including BCCC's decision to cancel some ETP courses and change other courses to electives in response to the a state legislative

---

[14]    The EEO complaint was dismissed more than two years before the termination decision was made, weakening the allegation of retaliatory motive.  Pl.'s Cross Mot. Ex. 2d, ECF No. 22-6.

action (resulting in fewer courses that Plaintiff was qualified to teach), and the inability of Plaintiff and his supervisors to agree on other TAU-qualifying options. Plaintiff alleges that Defendant Webb stated to him "I don't need people like you" shortly after she arrived at BCCC. Pl.'s Cross Mot. Ex 2h, ECF No. 22-10. The record does not show the context of this alleged statement, but Plaintiff proffered at the hearing that the statement was made in a meeting at Defendant Webb's office. This statement does not – absent facts establishing an appropriate context – suffice to support a valid fact finding of personal animus. Moreover, Plaintiff's argument that Webb showed personal animus in the way she evaluated Plaintiff is unpersuasive. Indeed, she did eventually amend her evaluation in response to Plaintiff's complaints. Pl.'s Cross Mot. 2i, ECF No. 22-11.

Finally, Defendant Ringgold's actions were alleged to be "intentional, willful and malicious," but those accusations are merely conclusory contentions. Compl. ¶ 56. Allegations that she knowingly relied on the allegedly inaccurate ratings to issue a decision of nonrenewal, failed to provide Plaintiff a copy of the final evaluation on time, did not permit Plaintiff to meet with the BCCC President, or failed to make a timely decision on Plaintiff's administrative complaint are not adequate to support a finding of personal animus. Id. ¶¶ 49-55.

Because Plaintiff cannot establish that these Individual
Defendants acted outside the scope of their employment or with
malice or gross negligence in terminating Plaintiff, they cannot
be held liable.  Accordingly, Defendants shall be granted
summary judgment on the claims in Counts II, III, and IV.

C. <u>Conspiracy to Interfere with Economic Relationship
   (Count V)</u>

Because the Court will grant summary judgment for
Defendants on the tortious interference claim, there is no
pending tort claim.  The Court shall, therefore, also grant
summary judgment for Defendants on the dependent civil
conspiracy claim.  <u>Lloyd v. Gen. Motors Corp.</u>, 397 Md. 108, 154,
916 A.2d 257, 284 (2007) ("'conspiracy' is not a separate tort
capable of independently sustaining an award of damages in the
absence of other tortious injury to the plaintiff.").

Moreover, any civil conspiracy claim among the three
Individual Defendants would be barred by the intracorporate
conspiracy doctrine.  <u>Baltimore-Washington Tel. Co. v. Hot Leads
Co., LLC</u>, 584 F. Supp. 2d 736, 744 (D. Md. 2008) ("a corporation
cannot conspire with its employees, and its employees, when
acting in the scope of their employment, cannot conspire among
themselves.").

Neither of the two exceptions to this "intracorporate conspiracy doctrine" exist. Employees of a corporation may be held liable as conspirators (1) when the agents have an "independent legal stake in achieving the corporation's legal objective" and (2) where the "acts of the employees were unauthorized by the corporate defendant." Id. Plaintiff does not even allege an independent legal stake for the Defendants in carrying out the alleged conspiracy, and as discussed above, the Court does not find persuasive the argument that the acts of the Individual Defendants, including the decision to terminate Plaintiff's contract, were unauthorized. See supra Section III.B.

Accordingly, Defendants shall be granted summary judgment on Count VI.


D. Deprivation of Property without Due Process (Count VI and VII)

Plaintiff alleges that Defendants violated a number of his procedural due process rights, which he claims were guaranteed to him under his contract and the College's faculty handbook. Pl.'s Cross Mot. Exs. 2, 3. These violations allegedly include:

- Failure of Iweha to assign courses to Plaintiff first before assigning to adjunct professors. Pl.'s Mem. at 21-22, ECF No. 22.

- Failure of Webb to "go over" Plaintiff's evaluation with him. Id.

- Failure of Ringgold to give Plaintiff a copy of his final evaluation. <u>Id.</u>

- Failure of Defendants to put Plaintiff on an "improvement plan" instead of terminating him. <u>Id.</u>

- Failure to be notified of Ringgold's recommendation of nonrenewal. <u>Id.</u>

- Failure to be notified 30 days before termination. <u>Id.</u>

- Failure to be terminated properly by the President and not Ringgold. <u>Id.</u>

- Failure of Ringgold to issue a decision regarding the grievance proceeding within 5 working days. <u>Id.</u>

- Denial of relief requested at the grievance proceeding, and subsequent denial of a "Level 3" proceeding. <u>Id.</u>

- The inability to have his attorney represent him at the grievance hearing, and the inability to call or examine witnesses at the grievance hearing. <u>Id.</u>

Defendants argue that due process was afforded and that the claims against the individual Defendants are barred by qualified immunity or state immunities laws.

### 1. <u>Fourteenth Amendment (Count VI)</u>

#### a. <u>Dismissal of State and College</u>

Plaintiff does not oppose the dismissal of Count VI against the State and the College. Pl.'s Mem. at 18, ECF No. 22 ("Plaintiff acknowledges that Count 6 . . . was intended to be filed against Defendants Webb, Iweha and Ringgold . . . in their

individual capacities."). Accordingly, summary judgment shall be granted for the State and the College on Count VI.

### b. Legal Standard for Due Process

When a party alleges procedural due process violations based on a state agency's policies or regulations, the court must consider whether "minimal due process requirements of notice and hearing have been met." Goodrich v. Newport News Sch. Bd., 743 F.2d 225, 227 (4th Cir. 1984). In the context of a termination of a public school teacher, the Fourth Circuit explained that "[m]inimal procedural due process required ... adequate notice, a specification of the charges against her, an opportunity to confront the witnesses against her and an opportunity to be heard in her own defense." Id.

When the minimal due process requirements of notice and hearing have been met, "a claim that an agency's policies or regulations have not been adhered to does not sustain an action for redress of procedural due process violations." Id. Thus, the Fourth Circuit rejected the Goodrich plaintiff's argument that she was given only two interim conferences rather than the three required by the School Board's evaluation procedure. See also Echtenkamp v. Loudon Cty. Pub. Sch., 263 F. Supp. 2d 1043, 1055 (E.D. Va. 2003) ("a violation of grievance procedures guaranteed under state law does not, by itself, constitute a

failure to provide adequate due process under the standards of the federal Constitution"); <u>Moore v. Bonner</u>, 758 F.2d 648 (4th Cir. 1985) (unpublished disposition) ("the failure of the School District to afford Moore a conference prior to not renewing her contract amounts to no more than a violation of the District's own policies and does not implicate the protections of the due process clause.").

### c. <u>Alleged Due Process Violations</u>

Here, the procedures for which Plaintiff alleges that he wrongfully was not afforded were based upon Plaintiff's employment contract and BCCC's Faculty Handbook. Thus, the issue is whether minimal due process requirements were met even though not all of BCCC's internal procedures were followed.

Considering all of the facts and circumstances, the Court finds that there is a genuine dispute of material fact as to whether Plaintiff was afforded minimal due process with regard to the termination of his employment.

It is undisputed that what the Defendants refer to as the "hearing" was held after Plaintiff had already been terminated. However, though the notice and opportunity to be heard is generally required before an alleged deprivation of property rights occurs. <u>See, e.g.</u>, <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542 (1985) ("We have described 'the root

requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing <u>before</u> he is deprived of any significant property interest.'") (emphasis in original).

There are material factual disputes about whether a meaningful opportunity to be heard was provided before termination. The post-termination "hearing" conducted in November 2016 may be found not adequate to meet due process requirements. On the other hand, a reasonable jury could find that the meeting conducted with Webb on March 10, 2016, any subsequent pre-termination meetings, and any subsequent letter correspondences challenging the 2015 evaluation were sufficient to meet minimal due process requirements.

Because the evidence now in the record could support a finding for either side, summary judgment is not appropriate. Accordingly, summary judgment on this claim shall now be denied.


d. <u>Qualified Immunity</u>

The Individual Defendants have asserted qualified immunity. "Qualified immunity, when found to apply, bars § 1983 suits against government officers in their individual capacity." <u>Cloaninger ex rel. Estate of Cloaninger v. McDevitt</u>, 555 F.3d 324, 330 (4th Cir. 2009). The qualified immunity inquiry by the court involves two steps: First, "whether a constitutional right

would have been violated on the facts alleged," and second, "whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." Id.

The Court recognizes that the analysis of qualified immunity is generally a legal one, id. at 331, but there is a genuine dispute of material fact regarding whether Plaintiff was afforded minimal procedural due process. Evidence regarding this issue may well reveal whether a reasonable official in the Individual Defendants' positions would have realized that his or her actions were unlawful at the time. Raub v. Campbell, 785 F.3d 876, 882 (4th Cir. 2015) ("we look not to whether the right allegedly violated was established 'as a broad general proposition' but whether 'it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.'").

At present, neither side is entitled to summary judgment with regard to the Individual Defendants' qualified immunity claims.

2.    Maryland State Constitution Article 24
      (Count VII)

a. Alleged Due Process Violations

The analyses under Due Process Clause of the Fourteenth
Amendment and under Article 24 of the Maryland State
Constitution are largely the same.  Pickett v. Sears, Roebuck &
Co., 365 Md. 67, 77 (2001) ("This Court has interpreted Article
24 of the Maryland Declaration of Rights and the Due Process
clause of the Fourteenth Amendment of the United States
Constitution to be in pari materia, such that the
interpretations of the Due Process clause of the Fourteenth
Amendment provided by the United States Supreme Court serve as
persuasive authority for Article 24.").  Accordingly, this claim
also remains pending.

b. State Immunities Laws

Under the Maryland Tort Claims Act ("MTCA"), "Maryland
officials are granted immunity . . . for state constitutional
violations committed within the scope of their duties when the
violations are made 'without malice or gross negligence.'"
Henry v. Purnell, 652 F.3d 524, 536 (4th Cir. 2011).  This
immunity covers "constitutional torts."  Lee v. Cline, 384 Md.
245, 266 (2004) ("[W]e hold that the immunity under the Maryland
Tort Claims Act, if otherwise applicable, encompasses

constitutional torts and intentional torts."). Unlike the doctrine of qualified immunity, the question of MTCA immunity is "subjective" under Maryland law and is generally a question for the jury. Henry, 652 F.3d at 536 ("Whether an officer's actions are grossly negligent, and therefore unprotected by statutory immunity, is generally a question for the jury.").

For the tortious interference and conspiracy claims, the Court has granted summary judgment for the Individual Defendants on Plaintiff's contentions that they acted outside the scope of their employment and with malice or gross negligence with regard to terminating Smith. See supra Section III.B. The issue now addressed is different, i.e., whether Plaintiff was afforded minimal due process by the Individual Defendants.

A reasonable jury could find that the Individual Defendants' actions with regard to Plaintiff's procedural due process rights were grossly negligent. The record reflects a genuine dispute of material fact about whether the Defendants recklessly failed to provide Plaintiff with proper notice and an opportunity to be heard with regard to his termination prior to termination. Newell v. Runnels, 407 Md. 578, 638 (2009) (gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the . . . property of another, and also implies a thoughtless disregard of

the consequences without the exertion of any effort to avoid them.")(citations omitted).

Accordingly, the Court finds that it shall grant neither side summary judgment on the state immunity law claims.

IV.    REQUEST REGARDING DEFENDANTS' EXHIBIT 1

Plaintiff requests the Court to "exercise its authority under Federal Rules of Evidence 102 and 104 to consider the admissibility of . . . . Defendant's Exhibit 1." Pl.'s Mem. at 7, ECF No. 22.  He claims that the document "is a creation of Defendants" which was "drawn from two other documents, i.e., Plaintiff's Ex. 2, Attachments G and J."  Id.  Despite the fact that his signature appears on Defendant's Exhibit 1, Plaintiff states that he did not actually sign the document in Defendant's Exhibit 1, and requests that it is stricken from the record.

There may be multiple versions of the 2015 evaluation.  The Court recognizes the dispute regarding the genuineness and admissibility of the document at issue.  It shall not grant summary judgment on the issue but shall, in due course, decide the matter appropriately at trial.

V.    Defendants' Motion for Leave to Supplement Their Motion

Defendants filed a Motion for Leave to supplement their motion with information about the BCCC President's delegation of

hiring and firing authority to agents within the school.  Def.'s Mem. at 1-2, ECF No. 26-1.  The requested supplement raises no new arguments but seeks to clarify the basis for a prior argument.  It is short and relevant, and Plaintiff has had an opportunity to refute the statements contained therein. Accordingly, the Court finds that allowing this amendment will not prejudice Plaintiff and will grant this motion.


VI.  <u>CONCLUSION</u>

For the foregoing reasons:

1. Defendants' Motion to Dismiss or, In the Alternative for Summary Judgment [ECF No. 18] is hereby GRANTED IN PART and DENIED IN PART, and Plaintiff's Cross Motion for Summary Judgment [ECF No. 21] is hereby DENIED.

   a. All Defendants are hereby granted summary judgment on Counts I, II, III, IV, and V.

   b. Defendants State of Maryland and Baltimore City Community College are hereby granted summary judgment on Plaintiff's Federal Due Process Claim (Count VI).

   c. Plaintiff's Federal Due Process Claim (Count VI) remains pending against the Individual Defendants[15] in their personal capacities.

   d. Plaintiff's State Due Process Claim (Count VII) remains pending against all Defendants.

2. Defendants' Motion for Leave to Supplement Their Motion To Dismiss Or, In the Alternative, For Summary Judgment [ECF No. 26] is GRANTED.

---

[15]  The Individual Defendants are Tonja L. Ringgold, Enyinnaya Iweha, and Cynthia Webb.

3. Plaintiff shall arrange a case-planning telephone conference to be held no later than April 25, 2018 to address the scheduling of further proceedings.

SO ORDERED, this <u>Wednesday, April 4, 2018</u>.

_____/s/_____
Marvin J. Garbis
United States District Judge
